## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **KATHLEEN CARR**, **KEEGAN KILLORY, AND KELSIE POWELL**, individually and on behalf of all similarly situated persons,<br><br>        Plaintiffs,<br><br>v.<br><br>**OKLAHOMA STUDENT LOAN AUTHORITY** and **NELNET SERVICING, LLC**,<br><br>        Defendants. | Case No. 5:23-cv-00099<br><br><br>Judge: Honorable David L. Russell<br><br><br>**JURY TRIAL DEMANDED** |

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kathleen Carr, Keegan Killory, and Kelsie Powell ("Plaintiffs") individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members" as defined below) and by and through their undersigned counsel, file this First Amended Class Action Complaint against Defendant Oklahoma Student Loan Authority ("OSLA") and Defendant Nelnet Servicing, LLC ("Nelnet") (collectively, "Defendants"), and allege as follows:

### I.    INTRODUCTION

1.    Only July 21, 2022, OSLA was notified that Plaintiffs' and the Class's sensitive personally identifiable information ("PII"), which OSLA was responsible for collecting, maintaining, protecting, securing, and safeguarding, was exposed to cyber criminals in a massive and preventable data breach affecting approximately 250,000

individuals (the "Data Breach"). Between June 2022 and July 2022, the unauthorized third-party had unfettered access to Plaintiffs' and the Class's highly sensitive PII where it was being inexplicably stored without sufficient data security and without sufficient oversight from OSLA. The confidential information exposed in the Data Breach includes Plaintiffs' and the Class's Social Security numbers, names, addresses, email addresses, and phone numbers. Due to OSLA's negligence, Plaintiffs and the Class will face an imminent risk of identity theft and fraud for the rest of their lives.

2.      OSLA is a federal student loan servicer who required Plaintiffs and Class Members to provide it with their PII in order to receive student loan servicing and other student loan related services. After gathering Plaintiffs' and the Class's PII, OSLA became directly responsible for ensuring that OSLA, or any party hired by OSLA, provided, and maintained adequate data security practices, procedures, protocols, and infrastructure. OSLA also became directly responsible for ensuring Plaintiffs' and Class Members' PII was protected and stored where unauthorized third parties could not gain unauthorized access.

3.      OSLA hired Nelnet to provide online technology services in relation to OSLA's student loan servicing such as a website portal and online payment processing services. Through this relationship, Nelnet collected and maintained and/or was given access to the PII of Plaintiffs and the Class.

4.      OSLA was negligent and/or failed to confirm when hiring Nelnet that Plaintiffs' and Class Members' PII would be protected from unauthorized access, that Nelnet maintained adequate data security, procedures, practices, infrastructure, and

protocols, and that Plaintiffs' and the Class's PII would not be exposed to data breaches.

5.      On or around July 21, 2022, OSLA learned that the vendor it negligently hired and negligently supervised – Nelnet – discovered a "vulnerability" which OSLA now believes led to the exposure of Plaintiffs' and Class Members' PII.

6.      Despite learning of the Data Breach in July 2022,  OSLA chose not to cause notice to be given to Plaintiffs and the Class until ***over a month later***.

7.      The notice of data breach letters sent to Plaintiffs and Class Members failed to explain why it took over a month (from July 21, 2022, to August 26, 2022) to alert Class Members that their sensitive PII had been exposed in the Data Breach. As a result of this delayed response, Plaintiffs and Class Members were unaware that their PII had been compromised, and that they were, and continue to be, at significant risk to identity theft and various other forms of personal, social, and financial harm.

8.      Due to Defendants' negligent and/or careless acts and omissions, and due to their utter failure to protect Class Members' sensitive data, Plaintiffs' and Class Members' unencrypted, unredacted PII was compromised. Hackers obtained Plaintiffs' and the Class's PII because of its value in exploiting and stealing their identities. The risks to Plaintiffs and the Class will remain for their respective lifetimes.

9.      Plaintiffs bring this class action lawsuit on behalf of the class they seek to represent, on behalf of all persons whose PII was compromised due to OSLA's failure to: (i) ensure Nelnet adequately protected Plaintiffs' and Class Members' PII; (ii) select a technology services provider with adequate data security, procedures, practices, infrastructure, and protocols; (iii) investigate Nelnet's data security measures prior to

hiring Nelnet to ensure they were adequate; (iv) supervise Nelnet's data security measures during the course of their relationship; (v) advise Nelnet of its duties under InfoSecPPG (described below); (vi) warn Plaintiffs and Class Members of Nelnet's inadequate information security practices; (vii) ensure Nelnet monitored Nelnet's network for security vulnerabilities and incidents; (viii) give timely notice of the Data Breach to Plaintiffs and the Class.

10.    Plaintiffs also bring this class action lawsuit on behalf of the class they seek to represent, on behalf of all persons whose PII was compromised due to Nelnet's failure to: (i) adequately protect the PII of Plaintiffs' and the Class; (ii) provide adequate data security to Plaintiffs' and the Class; (iii) effectively monitor its network for security vulnerabilities and incidents; and (iv) give timely notice of the Data Breach to Plaintiffs and the Class.

11.    The negligence of Defendants violates federal and state statutes, regulations, and security procedures and guidelines.

13.    As a result of Defendants' actions and/or inactions described herein, Plaintiffs and Class Members have suffered injuries. The injuries they have suffered include: (i) diminished or lost value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; change their usernames and passwords on their accounts; investigate, correct and resolve

unauthorized debits; deal with spam messages and e-mails received subsequent to the Data Breach, (v) charges and fees associated with fraudulent charges on their accounts, and (vi) the continued and certainly an increased risk to their PII, which remains in OSLA and Nelnet's possession and is subject to further unauthorized disclosures so long as OSLA and Nelnet fail to undertake appropriate and adequate measures to protect their PII. These risks will remain for the lifetimes of Plaintiffs and Class Members.

14.    Plaintiffs' and Class Members' rights were disregarded by OSLA and Nelnet intentionally, willfully, recklessly, or at the very least negligently by failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data and data security. Due to Nelnet's and OSLA's actions and/or inactions, Plaintiffs', and Class Members' PII was compromised through disclosure to an unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.    THE PARTIES

A.    **Defendants.**

15.    Defendant **OSLA** is an Oklahoma State Agency that is a student loan servicer for Federal Student Aid.[1] OSLA services over one million (1,000,000) student loan

---

[1]    *See* OSLA OKLAHOMA STUDENT LOAN SERVICING, *About OSLA*, https://public.osla.org/aboutOSLA (last visited Apr. 7, 2023).

accounts.[2] OSLA has a mailing address of P.O. Box 18475, Oklahoma City, OK 73154-0475. OSLA's principal place of business is located at 525 Central Park Drive, Suite 600, Oklahoma City, OK 73105.  At all times relevant hereto, OSLA was responsible for vetting, supervising, and monitoring entities it hired to provide technology services, such as Nelnet.

16.    Defendant **Nelnet** is a student loan servicing company, which was hired by OSLA to provide technology services related to student loan servicing. Nelnet has a principal place of business at 121 S. 13th Street, Suite 100, Lincoln, Nebraska 68508. As part of Nelnet's agreement to provide technology services to OSLA, Nelnet collected, handled, maintained, and/or acquired the PII of Plaintiffs and the Class.

**B.    Plaintiffs.**

17.    Plaintiff **Kathleen Carr** ("Plaintiff Carr") is a resident of Freehold, New Jersey. Plaintiff Carr is a victim of the Data Breach and received a notice of data breach letter ("Notice Letter") from OSLA, notifying her that her name, address, email address, phone number, and Social Security number, were compromised in the Data Breach.

18.    Plaintiff **Keegan Killory** ("Plaintiff Killory") is a resident of Plymouth, Massachusetts. Plaintiff Killory  is a victim of the Data Breach and received a Notice Letter from OSLA, notifying him that his name, address, email address, phone number, and Social Security number, were compromised in the Data Breach.

---

[2] *Id.*

19.    Plaintiff **Kelsie Powell** ("Plaintiff Powell") is currently a resident Bloomington, Indiana, with a permanent address in Redford, Michigan. Plaintiff Powell is a victim of the Data Breach and received a Notice Letter from OSLA, notifying her that her name, address, email address, phone number, and Social Security number, were compromised in the Data Breach.

### III.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendant.

20.    The Western District of Oklahoma has personal jurisdiction over Defendants because Defendants are incorporated and/or have their principal place of business in this District; conduct substantial business in this District through their headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise have substantial contacts with this District and purposely availed themselves to the Courts in this District.

21.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, and OSLA's principal place of business is in this District.

## IV.    PLAINTIFFS COMPLIED WITH THE OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT 51 O.S. § 151 *ET SEQ.*

22.     Plaintiffs aver they complied with the notice provisions of the Oklahoma Governmental Tort Claims Act prior to filing their lawsuit.

23.     **Plaintiff Carr** complied with the provisions of the Oklahoma Governmental Tort Claims Act 51 O.S. § 151 *et seq.* before filing this lawsuit. Specifically, Plaintiff Carr: (1) filed a written claim with the Office of the Risk Management Administrator of the Office of Management and Enterprise Services; (2) the written claim was received by the Office of Management and Enterprise Services on September 19, 2022; (3) the written claim contained the date, time, place, circumstances of the claim, the identity of the state agency involved, the amount of compensation demanded, the claimant's name, the claimant's address, the claimant's telephone number, and the name of the attorney authorized to settle the claim. *See* 51 O.S. § 156. In a letter dated September 20, 2022, the Claims Manager of the State of Oklahoma Risk Management Department asked for "claim supporting documentation" with no clarification. The letter stated if no additional documentation was received, the claim would stand denied at the end of the expiration of 90 days from the date of October 4, 2022. Thus, the claim was effectively denied January 2, 2023, permitting Plaintiff Carr to file her lawsuit.

24.     **Plaintiff Killory** complied with the provisions of the Oklahoma Governmental Tort Claims Act 51 O.S. § 151 *et seq.* before filing this lawsuit. Specifically, Plaintiff Killory: (1) filed a written claim with the Office of the Risk Management Administrator of the Office of Management and Enterprise Services; (2) the written claim

was received by the Office of Management and Enterprise Services on November 4, 2022;

(3) the written claim contained the date, time, place, circumstances of the claim, the identity

of the state agency involved, the amount of compensation demanded, the claimant's name,

the claimant's address, the claimant's telephone number, and the name of the attorney

authorized to settle the claim. *See* 51 O.S. § 156. In a letter dated February 16, 2023, the

Claims Manager of the State of Oklahoma Risk Management Department stated Plaintiff

Killory's claim was deemed denied as of February 2, 2023, permitting Plaintiff Killory to

file a lawsuit before August 1, 2023.

26.    **Plaintiff Powell** complied with the provisions of the Oklahoma

Governmental Tort Claims Act 51 O.S. § 151 *et seq.* before filing this lawsuit. Specifically,

Plaintiff Powell: (1) filed a written claim with the Office of the Risk Management

Administrator of the Office of Management and Enterprise Services; (2) the written claim

was received by the Office of Management and Enterprise Services on November 4, 2022;

(3) the written claim contained the date, time, place, circumstances of the claim, the identity

of the state agency involved, the amount of compensation demanded, the claimant's name,

the claimant's address, the claimant's telephone number, and the name of the attorney

authorized to settle the claim. *See* 51 O.S. § 156. In a letter dated February 16, 2023, the

Claims Manager of the State of Oklahoma Risk Management Department stated Plaintiff

Powell's claim was deemed denied as of February 2, 2023, permitting Plaintiff Powell to

file a lawsuit before August 1, 2023.

26.    None of the exemptions of liability appearing in O.S. § 155 apply to OSLA.

However, specifically, O.S. § 155(18) *does not apply* to the present litigation. This

exemption simply means that OSLA cannot be liable solely for the acts of an independent contractor or consultant. *See* O.S. § 155(18). This provision does not immunize OSLA for its own negligence and misconduct. The Complaint alleges multiple negligent acts by OSLA that are separate and apart from, or in the alternative to, the negligent acts of Nelnet.

## V.    FACTUAL ALLEGATIONS

### A.    The Data Breach.

28.    Plaintiffs, who previously had or who currently have their student loans serviced by OSLA, received Notice Letters from OSLA dated August 26, 2022, notifying them that their Social Security numbers, names, addresses, email addresses, and phone numbers, were exposed in the Data Breach.[3]

29.    According to the Notice Letter sent by OSLA, on July 21, 2022, OSLA received notice of suspicious activity that made the PII of Plaintiffs' and the Class, which was collected by OSLA, accessible to an unauthorized third-party.[4]

30.    Weeks after OSLA received notice of the Data Breach (approximately a month later), OSLA informed the Data Breach victims, *i.e.*, Plaintiffs and the Class, that "certain student loan account registration was accessible by an unknown party beginning in June 2022, and ending on July 22, 2022."[5] After an investigation, it was determined that Plaintiffs' and Class Members' names, addresses, email addresses, phone numbers, and

---

[3] *See* Exhibits 1–3 (Notice Letters).

[4] *Id.*

[5] *Id.*

Social Security numbers were exposed in the Data Breach.

31.    However, OSLA did not disclose the cause(s) of the Data Breach, when the

Data Breach started, or why it took OSLA approximately one month after discovery of the

Data Breach to notify Plaintiffs and Class Members.

32.    An excerpt of the Notice Letters OSLA sent to Plaintiffs' and the Class reads:

> **What Happened?** On July 21, 2022, Nelnet Servicing, LLC
> (Nelnet), our servicing system and customer website portal
> provider, notified us that they had discovered a vulnerability
> that we believe led to this incident. Nelnet informed us that its
> cybersecurity team took immediate action to secure the
> information system, block the suspicious activity, fix the issue,
> and launched an investigation with third-party forensic experts
> to determine the nature and scope of the activity. On August
> 17, 2022, this investigation determined that certain student
> loan account registration information was accessible by an
> unknown party beginning in June 2022, and ending on July 22,
> 2022. Following these actions, they notified the U.S.
> Department of Education who in turn notified law
> enforcement. We are fully cooperating with the law
> enforcement investigations, OSLA's systems and accounts that
> are hosted by Nelnet were not impacted by this incident.
>
> **What Information Was Involved?** Nelnet's investigation
> determined that the impacted information included your name,
> address, email address, phone number, and Social Security
> number. This incident did not impact the security of your
> financial account numbers or payment information.

33.    After receiving the Notice Letters, it is reasonable for recipients, including

Plaintiffs and Class Members, to believe that the risk of future harm (including identity

theft) is substantial and imminent, and that it its necessary for them to take steps to mitigate

that substantial risk of impending and future harm. Indeed, OSLA admonishes victims of

the Data Breach to "remain vigilant against incidents of identity theft and fraud over the

next 24 months, by reviewing [] account statements and monitoring [] free credit reports for suspicious activity and to detect errors."

34.    OSLA made a token gesture of a mere twenty-four (24) months of credit monitoring services to Plaintiffs and the Class – an offer it need not have provided absent any threat to Plaintiffs and the Class.[6] However, this offer is woefully inadequate considering Plaintiffs and Class Members will be at a continued risk of fraud and identity theft for the rest of their lives. This gesture does not and will not fully protect Plaintiffs and the Class from cybercriminals and is largely ineffective against protecting data after it has been stolen. Cybercriminals are fully aware of the well-publicized preventative measures taken by entities after data breaches such as that which happened here and will, therefore, oftentimes hold onto the stolen data and not use it until after the complimentary service is no longer active, and long after victim concerns and preventative steps have diminished.

35.    Upon information and belief, the unauthorized third-party cybercriminals intentionally targeted and gained access to the PII with the intent of engaging in misuse of the PII, including marketing and selling Plaintiffs' and Class Members' PII to fraudsters as that is the *modus operandi* of data thieves.

36.    In effect, Defendants are shirking their responsibility for the harm and increased risk of harm they have caused Plaintiffs and members of the Class, including the distress and financial burden the Data Breach has placed upon the shoulders of the Data Breach victims.

---

[6] *See* Exhibits 1, 2, and 3 (Notice Letters).

37.    The Notice Letter provided by OSLA fails to provide the consolation Plaintiffs and Class Members seek and certainly falls far short of eliminating the substantial risk of fraud and identity theft Plaintiffs and the Class now face.

38.    To make matters worse, the attackers intentionally targeted and gained access to Plaintiffs' and Class Members' PII. While many cyberattacks merely involve the attacker gaining control of the computer or network without access to the victims' information, the cyberattack gave the attackers access to Plaintiffs' and Class Members' PII.

39.    Plaintiffs' and Class Members' information is likely for sale on the dark web. Their PII could also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and/or Class Members. Either way, unauthorized individuals can easily access and misuse the PII of Plaintiffs and Class Members.

**B.    The Unauthorized Intruder Acted with Actual Malice.**

40.    The cyber-attackers here acted with actual malice and with a criminal motive. As the result of the Data Breach, Plaintiffs' and Class Members' PII has been exposed. The investigation into the Data Breach confirmed the network was intentionally breached ***for at least one month***.

41.    The parts of the network accessed by the attackers contained Plaintiffs' and the Class's unsecured PII. The Notice Letter states: "Nelnet's investigation determined that

the impacted information included your name, address, email address, phone number, and Social Security number."[7]

42.    Ransomware attacks are typically the last phase of a multi-pronged cyberattack that is targeted at confidential data. The prime motivation of ransomware is the theft of confidential data like the Social Security numbers stolen here. A recent analysis shows that data exfiltration occurs in 70% of all ransomware attacks.[8] Ransomware attacks are often used to distract security teams because "it provides the perfect cover to distract attention so they can take aim at their real target: exfiltrating IP, research, and other valuable data."[9]

43.    Ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[10] As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence [...] the initial assumption

---

[7] *Id.*

[8] Jessica Davis, *70% Ransomware Attacks Cause Data Exfiltration; Phishing Top Entry Point*, HEALTH IT SECURITY (Feb. 3, 2021), https://healthitsecurity.com/news/70-ransomware-attacks-cause-data-exfiltration-phishing-top-entry-point (last visited Apr. 7, 2023).

[9] Matt Lock, *Ransomware provides the perfect cover,* HELPNET SECURITY (Jan. 21, 2021), https://www.helpnetsecurity.com/2021/01/21/ransomware-cover/ (last visited Apr. 7, 2023).

[10] *Ransomware: The Data Exfiltration and Double Extortion Trends,* MS-ISAC MULTI-STATE INFORMATION SHARING & ANALYSIS CENTER, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends.

should be that data may have been exfiltrated."[11] Once the data is exfiltrated from a

network, its confidential nature is destroyed and it should be "assume[d] it will be traded

to other threat actors, sold, or held for a second/future extortion attempt."[12] And even where

companies pay for the return of data, attackers often leak or sell the data regardless because

there is no way to verify copies of the data are destroyed.[13]

**C.    The Type of Data Compromised Here Can be Used for Fraud and Identity Theft.**

44.    The type of data that was accessed and compromised here (including full

names and Social Security numbers) can easily be used to perpetrate fraud and identity

theft. Social Security numbers are widely regarded as the most sensitive information

hackers can access due to their durability.

45.    Social Security numbers are the "gold standard" for identity theft.

46.    Experience and common sense teach that Plaintiffs face a substantial risk of

identity theft given that their Social Security numbers and name were intentionally targeted

and accessed by a criminal intruder.

47.    When a Social Security number is stolen it can forever be wielded to identify

the victim and target him/her in fraudulent schemes and identity theft attacks and it appears

that for Plaintiffs it already has been as a result of the Data Breach.

---

[11] *The chance of data being stolen in a ransomware attack is greater than one in ten*, EMISOFT (July 13, 2020),  available at  https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/.

[12] *Id.*

[13] *Id.*

**D.    The PII Exposed is Highly Valuable on the Black Market.**

48.    The information targeted in the attack and exposed by Defendants is a virtual goldmine for phishers, hackers, identity thieves and cybercriminals.

49.    Stolen PII is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal identities and online activity.

50.    When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[14]

51.    For example, when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of

---

[14]    *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb 2, 2020), available at https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Apr. 7, 2023).

potential sources for hackers to target."[15]

52.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

53.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned

---

[15]  *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (Apr. 3, 2018), available at https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Apr. 7, 2023).

[16]  Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Apr. 7, 2023); *see also For Sale in the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Apr. 7, 2023).

[17]*For Sale in the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Apr. 7, 2023).

down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

54.      What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

55.      Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

56.      Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

57.      The PII compromised in the Data Breach demands a much higher price on

---

[18]  *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION (July 2021),  available at https://www.ssa.gov/pubs/EN-05-10064.pdf.

[19] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015, 4:59 AM ET), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Apr. 7, 2023).

the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[20]

58.    Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

59.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

60.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." OSLA did not rapidly report to Plaintiffs and Class Members that their PII had been stolen. It took OSLA weeks to notify Plaintiffs of the compromise.

61.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

62.    Data breaches facilitate identity theft as hackers intentionally target and

---

[20] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD, (Feb. 6, 2015, 5:49 AM PST), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Apr. 7, 2023).

obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

### E. OSLA and Nelnet Failed to Comply with Regulatory Duties Proscribed by the Oklahoma Office of Management and Enterprise Services Information Services ("OMES") to Protect Plaintiffs' and the Class's PII.

63.    Oklahoma statutes imposed duties on OSLA and Nelnet that were designed to protect and regulate the disclosure of Plaintiffs' and the Class's PII.

64.    Specifically, OSLA was required to comply with certain minimum mandatory standards for information security set for it by OMES.[21] Implementing a statutory directive, OMES has promulgated the "Information Securities Policies, Procedures, Guidelines" (hereinafter referred to as the "InfoSecPPG"), which sets the minimum information security standards that all state agencies, including OSLA, were required to meet.[22]

65.    Nelnet was also required to comply with these minimum mandatory standards for information security set forth by OMES as an entity, and/or contractor hired by OSLA for technology services.[23] Thus, Nelnet was also required to maintain compliance

---

[21] 62 O.S. § 34.12(A)(3).

[22] State of Oklahoma, OMES ISD, "Information Security Policies, Procedures, Guidelines," Version 1.5, Rev. Dec. 2017, available at https://omes.ok.gov/sites/g/files/gmc316/f/InfoSecPPG_0.pdf (last accessed Apr. 12, 2023).

[23] *Id.* at p. 6.

with every standard set forth in the InfoSecPPG.

66.    The PII of Plaintiffs and the Class, which was collected and maintained by OSLA constituted State information because it was collected during the regular course of OSLA servicing student loans. By virtue of Nelnet's relationship with OSLA, Nelnet also had access to this State information.

67.    The version of the InfoSecPPG applicable during the relevant period gave OSLA the non-delegable duty to, among many other things: (1) follow the procedures, guidelines, and practices promulgated by OMES in the InfoSecPPG to create and maintain "a secure environment for the storage and dissemination of information";[24] (2) apply the InfoSecPPG procedures, guidelines, and best practices to all hardware facilities, software installations, communication networks, as well as information;[25] and (3) communicate the procedures, guidelines, and best practices promulgated in the InfoSecPPG to "contractors or other entities whose position responsibilities include the creation, maintenance, or access of State information residing on any computer system or platform" to ensure the InfoSecPPG standards are implemented by the contractor.[26] Despite OSLA's knowledge of these duties, OSLA failed to communicate them to Nelnet and failed to ensure these duties, procedures, and standards were upheld and implemented by Nelnet.[27]

---

[24] *Id.* at § 1.0(1).

[25] *Id.* at § 1.1(1).

[26] *Id.* at § 1.3(1).

[27] Nelnet was also required to comply with these minimum mandatory standards for information security set forth by OMES IS as an entity, and/or contractor hired by OSLA

68.    The InfoSecPPG explicitly states *"[t]he confidentiality of all information created or hosted by a State Agency is the responsibility of all State Agencies*…The highest of ethical standards are required to prevent the inappropriate transfer of sensitive or confidential information."[28]

69.    Additionally, the InfoSecPPG states "[a]ll information content hosted by a state agency is owned by and is the primary responsibility of the Agency responsible for collecting and maintaining the authenticity, integrity and accuracy of information. *The objective of the owning State Agency is to protect the information from inadvertent or intentional damage as well as unauthorized disclosure*..."[29]

70.    OSLA failed to comply with these responsibilities and duties by failing to ensure Nelnet maintained adequate data security, procedures, and protocols in compliance with the InfoSecPPG.

71.    OSLA also failed to comply with the InfoSecPPG § 4.1, which requires entities to undergo a risk assessment to determine the likelihood of an adverse event, the threats to system resources, the vulnerability of the system, and the impact such an adverse event may have. OSLA hired Nelnet to provide technology services related to OSLA's student loan servicing. In turn, Nelnet was given access to the confidential PII of Plaintiffs and the Class by OSLA, which was collected and stored by OSLA and Nelnet. As a

---

for technology services. *Id.* at p. 6.

[28] *Id.* at § 2.1(2).

[29] *Id.* at § 2.2(1).

contractor and entity hired by OSLA, OSLA was duty-bound to ensure Nelnet conducted and completed the risk assessment proscribed by InfoSecPPG § 4.1. OSLA, did not ensure Nelnet completed the risk assessment outlined in InfoSecPPG § 4, which contributed to the unlawful disclosure of Plaintiffs and the Class's PII in the Data Breach.

72.    Moreover, OSLA failed to brief Nelnet, a contractor of OSLA, of: (1) Nelnet's responsibilities for safeguarding sensitive information and assets; and (2) all information security policies, procedures, guidelines, and best practices outlined in the InfoSecPPG, despite being specifically mandated to.[30] OSLA also never gave Nelnet "a written document outlining the contents of the briefing and the date" nor was this non-existent written document "signed by the [Nelnet] acknowledging receipt of its contents."[31] With no data security parameters given to Nelnet by OSLA, Nelnet was free to use whatever data security measures (if any) that it pleased. Therefore, Nelnet chose not to comply with the InfoSecPPG Guidelines and provided inadequate data security to Plaintiffs and the Class.

73.    What is more telling, OSLA knew of the data security risks hiring Nelnet could cause but chose to turn a blind eye to these warnings. The InfoSecPPG plainly warned OSLA that the use of an external contractor "may introduce potential security exposures, such as the possibility of compromise…"[32] Thus, OSLA new of the risk of using

---

[30] *Id.* at §§ 5.2(5)(A–C).

[31] *Id.* at § 5.2(5)(D).

[32] *Id.* at § 7.9(1).

Nelnet's outside services to handle Plaintiffs' and the Class's PII, but deliberately chose to proceed with using Nelnet's technology services with inadequate data security.

74.    Further, the InfoSecPPG section 7.9(2) states "Prior to using external facilities, the risks must be identified and appropriate controls agreed with the contractor and incorporated into the contract. Particular issues that should be addressed include (A) identifying sensitive or critical applications better retained in-house, (B) obtaining the approval of business application owners, (C) implications for business continuity plans, (D) security standards to be specified and the process for measuring compliance, (E) allocation of specific responsibilities and procedures to effectively monitor all relevant security activities, and (F) responsibilities and procedures for reporting and handling security incidents."[33] OSLA never underwent this analysis when hiring Nelnet. Rather, OSLA did no background investigation to ensure Nelnet complied with any of the InfoSecPPG security standards (or if OSLA did, OSLA deliberately employed Nelnet's services despite Nelnet's inadequacies).

75.    The data collected and maintained by OSLA and Nelnet was also not properly encrypted, making it easy for cybercriminals to access Plaintiffs' and the Class's PII. Per the InfoSecPPG section 7.10, "[e]ncryption should be applied to protect the confidentiality of sensitive or critical information." Plaintiffs' and the Class's PII is and was sensitive and critical information, however, OSLA failed to ensure Nelnet encrypted this data and indeed, Nelnet failed to encrypt this data, which contributed to the Data

---

[33] *See also id.* at § 9.22.

Breach and the exposure of Plaintiffs' and the Class's PII.

76.     In short, OSLA owed, and continues to owe, duties of care to Plaintiffs and Class Members to: (1) exercise reasonable care to secure and protect the PII in its possession and the PII in the possession of any entity it hired to provide technology services – *i.e.*, Nelnet – from unauthorized access; (2) ensure Nelnet implemented adequate data security, practices, procedures, infrastructure, and protocols compliant with the InfoSecPPG and other applicable law; (3) brief and advise Nelnet of its duties under the InfoSecPPG; (4) ensure Nelnet had adequate processes in place to quickly detect a data breach and to timely act on warnings about data breaches; (5) investigate Nelnet's data security practices, infrastructure, procedures, and protocols prior to hiring Nelnet; and (6) monitor Nelnet's security procedures, practices, and protocols during the relationship. Finally, OSLA had a duty to promptly report the Data Breach to law enforcement, to promptly investigate the causes of the breach, and to promptly notify affected persons. OSLA has utterly failed to uphold these duties, as evidenced by the Data Breach, thereby breaching its duties owed to Plaintiffs and the Class.

77.     Similarly, Nelnet owed, and continues to owe, duties of care to Plaintiffs and Class members to: (1) exercise reasonable care to secure and protect the PII in its possession; (2) implement adequate data security, practices, procedures, infrastructure, and protocols compliant with the InfoSecPPG and other applicable law; (3) have adequate processes in place to quickly detect a data breach and to timely act on warnings about data breaches; and (4) give timely notice of Data Breaches. Nelnet has utterly failed to uphold these duties, as evidenced by the Data Breach, constituting a breach of its duties owed to

Plaintiffs and the Class.

78.    As a direct and proximate cause of the Defendants' breaches, Plaintiffs and the Class have been damaged as set forth herein.

79.    Accordingly, both Defendants are joint and severally liable for their negligence to Plaintiffs and the Class for failing to adequately protect and secure their PII.

**F.    Nelnet Failed to Comply with Federal Trade Commission Requirements.**

75.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[34]

76.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[35] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement

---

[34] *See Start with Security: A Guide for Business*, FEDERAL TRADE COMMISSION, (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[35] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[36]

77.    Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[37]

78.    Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[38]

---

[36] *Id.*

[37] *See Start with Security: A Guide for Business*, FEDERAL TRADE COMMISSION, (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[38] *Privacy and Security Enforcement,* Press Releases, FEDERAL TRADE COMMISSION https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Apr. 7, 2023).

79.     By negligently securing Plaintiffs' and Class Members' PII and allowing an unknown third-party cyber-attacker to access the unencrypted, unprotected PII, Nelnet failed to employ reasonable and appropriate measures to protect against unauthorized access to confidential PII. Nelnet's data security policies and practices constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**G.     Defendants collected, stored, and maintained Plaintiffs' and Class Members' PII.**

80.     OSLA acquired, collected, and stored Plaintiffs' and Class Members' PII. By virtue of OSLA's relationship with Nelnet, Nelnet also acquired, collected, and stored Plaintiffs' and Class Members' PII through the technology services it provided to OSLA.

81.     At all relevant times, Defendants knew or should have known that Plaintiffs and the Class were required to store and/or share sensitive data with them, including highly confidential PII.

82.     Plaintiffs and Class Members were required to provide their PII to Defendants as a condition to receiving student loan related services. Implicit in this exchange was that Defendants would keep Plaintiffs' and Class Members' PII safe and would delete it once it was no longer necessary to maintain the PII. Plaintiffs and Class Members would not have provided their PII, would have taken other precautions, or would have reported Defendants to the appropriate entity had they known that Defendants would not safeguard their PII. Nelnet's failure to implement adequate security measures to protect the PII of Plaintiffs and Class Members, and OSLA's failure to ensure Nelnet implemented

adequate security measures to protect the PII of Plaintiffs and the Class, constituted a denial

of Plaintiffs' and Class Members' expected benefit of the contract between the parties.

83.    By obtaining, collecting, and storing Plaintiffs' and Class Members' PII,

Defendants assumed legal and equitable duties and knew or should have known that they

were responsible for protecting Plaintiffs' and Class Members' PII from unauthorized

disclosure.

84.    Plaintiffs and Class Members have taken reasonable steps to maintain the

confidentiality of their PII. Plaintiffs and Class Members relied on Defendants to keep their

PII confidential and securely maintained, to use this information for business purposes

only, and to make only authorized disclosures of this information.

85.    Nelnet could have prevented this Data Breach by properly securing and

encrypting Plaintiffs' and Class Members' PII. Similarly, OSLA could have prevented the

Data Breach by ensuring Nelnet properly secured and encrypted Plaintiffs' and Class

Members' PII.

86.    Defendants' negligence in safeguarding Plaintiffs' and Class Members' PII

is exacerbated by repeated warnings and alerts directed to protecting and securing sensitive

data, as evidenced by the trending data breach attacks in recent years and the guidance

OSLA was aware of in the InfoSecPPG.[39]

87.    In addition to Defendants' obligations under federal and state laws,

Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in

---

[39] *Id.* at §§ 5.2(5)(A–C), 7.9(2).

obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that the computer systems, networks, and protocols the PII was stored on adequately protected the PII of the Class.

88.    Nelnet owed a duty to Plaintiffs and the Class to design, maintain, and test its computer systems and networks to ensure that the PII in its possession was adequately secured and protected. While OSLA owed a duty to Plaintiffs and the Class to ensure Nelnet designed, maintained, and tested its computer systems and networks to ensure that the PII in its possession would be adequately secured and protected.

89.    Nelnet owed a duty to Plaintiffs and the Class to create and implement reasonable data security practices and procedures to protect the PII in its possession. OSLA owed a duty to Plaintiffs and the Class to ensure Nelnet created and implemented reasonable data security practices and procedures to protect the PII in its possession.

90.    Nelnet owed a duty to Plaintiffs and the Class to implement processes that would detect a breach on its data security systems in a timely manner. OSLA owed a duty to Plaintiffs and the Class to ensure Nelnet implemented processes that would detect a breach on its data security systems in a timely manner.

91.    Nelnet owed a duty to Plaintiffs and the Class to act upon data security warnings and alerts in a timely fashion. OSLA owed a duty to Plaintiffs and the Class to ensure Nelnet acted upon data security warnings and alerts in a timely fashion.

92.    Nelnet owed a duty to Plaintiffs and the Class to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII with Defendant. OSLA owed a duty to Plaintiffs and the Class to disclose if Nelnet's computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII with OSLA and/or Nelnet.

93.    Defendants owed a duty of care to Plaintiffs and the Class because they were foreseeable and probable victims of any inadequate data security practices.

94.    Nelnet owed a duty to Plaintiffs and the Class to encrypt Plaintiffs' and Class Members' PII and monitor user behavior and activity in order to identity possible threats. OSLA owed a duty to Plaintiffs and the Class to ensure Nelnet encrypted Plaintiffs' and Class Members' PII and to ensure Nelnet monitored user behavior and activity in order to identify possible threats.

95.    As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, the criminal(s) and/or the criminal's customers now have Plaintiffs' and the other Class Members' PII.

96.    There is a robust international market for the purloined PII. Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs

and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft, and identity fraud.[40]

97.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy and property rights, and harmed them in the process, by not obtaining Plaintiffs' and Class Members' prior written consent to disclose their PII to any other person as required by laws, regulations, industry standards and/or internal company standards.

98.    Defendants flagrantly disregarded and/or violated Plaintiffs' and Class Members' privacy and property rights, and harmed them in the process, by failing to safeguard and protect and, in fact, wrongfully disseminating Plaintiffs' and other Class Members' PII to unauthorized persons.

**H.    The Value of PII.**

99.    The PII accessed in the Data Breach represents a major score for cybercriminals. This information is of great value to them, and the data stolen in the Data Breach will be used in a variety of sordid ways for criminals to exploit Plaintiffs and the Class Members and to profit off their misfortune.

100.    Indeed, it is well known and the subject of many media reports that PII is highly coveted and a frequent target of hackers. Despite the frequent public announcements

---

[40]According to the United States Government Accounting Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities. Identity theft occurs when PII is used to commit fraud or other crimes. These crimes include, *inter alia,* credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services).

of data breaches of corporate entities, Nelnet maintained insufficient and inadequate systems to protect the PII of Plaintiffs and Class Members.

101.    PII is a valuable commodity for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on a number of underground Internet websites.

102.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[41] For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[42] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

103.    Indeed, it is well known and the subject of many media reports that PII is highly coveted and a frequent target of hackers. Despite the frequent public announcements

---

[41] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Apr. 7, 2023) (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[42] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Credit.com (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last visited Apr. 7, 2023).

of data breaches of corporate entities, Defendants maintained an insufficient and inadequate system to protect the PII of Plaintiffs and Class Members.

104.   PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

105.   For example, it is believed that certain PII compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma. Such fraud will be an omnipresent threat for Plaintiff and Class Members for the rest of their lives. They will need to remain constantly vigilant for identity theft.

106.   The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

107.   Identity thieves can use personal information, such as that of Plaintiffs and Class Members which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain

government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

108.    The ramifications of Defendants' failure to keep secure Plaintiffs' and Class Members' PII are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

109.    The PII of Plaintiffs and Class Members was targeted and taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years for some Class Members.

110.    In this context, at all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding Plaintiffs' and Class Members' PII, including Social Security numbers and/or dates of birth, and of the foreseeable consequences that would occur if Nelnet's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

111.    As a result of the Data Breach, the PII of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class Members, or likely to be suffered thereby as a direct result of Defendants' Data Breach, include:

a.    unauthorized use of their PII;

b.    theft of their personal and financial information;

35

c.      costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.      damages arising from the inability to use their PII;

e.      Improper disclosure of their PII;

f.      loss of privacy, and embarrassment;

g.      trespass and damage their personal property, including PII;

h.      costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, purchasing credit monitoring and identity theft protection services, and the stress, nuisance, and annoyance of dealing with all issues resulting from the Data Breach;

i.      the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their PII being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class Members' information on the Internet black market;

j.      damages to and diminution in value of their PII entrusted to Defendants for the sole purpose of employment by Defendant; and

k.      the loss of Plaintiffs' and Class Members' privacy.

112.    The injuries to the Plaintiffs and Class Members were directly and proximately caused by Nelnet's failure to implement or maintain adequate data security measures for Plaintiffs' and the Class's PII and OSLA's failure to ensure Nelnet implemented or maintained adequate data security measures for Plaintiffs' and the Class's PII.

113.    The Data Breach was the inevitable result of Defendants' inadequate approach to data security and the protection of the PII that it collected during the course of business and, as such, Defendants could have prevented this Data Breach. Defendants had the resources to prevent the Data Breach, but Nelnet neglected to adequately invest in data security, despite the growing number of well-publicized data breaches and OSLA failed to engage a technology service with adequate data security.

114.    Had Nelnet remedied the deficiencies in its data security systems, followed security guidelines, and adopted security measures recommended by experts in the field, Nelnet could have prevented the Data Breach and, ultimately, the theft of Plaintiffs' and the Class's PII. Had OSLA chosen a technology service with adequate data security systems, followed security guidelines set forth by OMES IS, and ensured Nelnet implemented adequate data security, OSLA could have prevented the Data Breach. Defendants are jointly and severally liable for the harms caused to Plaintiffs and the Class.

115.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring

and will continue to incur such damages in addition to any actual fraudulent usage of their PII.

116.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures, procedures, protocols, and contractors for the PII of Plaintiff and Class Members.

117.    This was a financially motivated and targeted Data Breach. The PII exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein.

118.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[43]

119.    Data breaches are preventable.[44] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[45] She added that "[o]rganizations that

---

[43]  Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info (last visited Apr. 7, 2023).

[44]  Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012) available at https://catalog.libraries.psu.edu/catalog/6962778.

[45]  *Id.* at 17.

collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[46]

120.    Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[47]

121.    OSLA and/or Nelnet required Plaintiffs and Class Members to surrender their PII – including but not limited to their names and Social Security numbers – and Nelnet and OSLA were entrusted with properly holding, safeguarding, and protecting against unlawful disclosure of such PII.

122.    Many failures laid the groundwork for the success ("success" from the cyber-attackers' viewpoint) of the Data Breach, starting with OSLA's failure to ensure Nelnet maintained adequate data security to protect the PII of Plaintiffs and the Class before hiring it. Likewise, Nelnet failed to incur the costs necessary to implement adequate and reasonable cyber security protections, procedures, and protocols necessary to safeguard Plaintiffs' and Class Members' PII.

123.    Nelnet and OSLA knew of the importance of safeguarding Plaintiffs' and Class Members' PII and of the foreseeable consequences that would occur if Plaintiffs' and

---

[46]  *Id.* at 28.

[47]  *Id.*

Class Members' PII was stolen, including the significant costs that would be placed on Plaintiffs and Class Members as a result of a breach of this magnitude.

124.    Nelnet is a sophisticated organization with the resources to deploy robust cybersecurity protocols. Nelnet knew, or should have known, that the development and use of such protocols were necessary to fulfill their statutory, regulatory, and common law duties to Plaintiffs and Class Members. Nelnet's failure to do so is, therefore, intentional, willful, reckless and/or grossly negligent.

125.    OSLA is a sophisticated organization with the resources to ensure the entities it hired deployed robust cybersecurity protocols. OSLA knew, or should have known, that hiring an entity that used such protocols was necessary to fulfill their statutory, regulatory, and common law duties to Plaintiffs and Class Members. OSLA's failure to ensure Nelnet did so is, therefore, intentional, willful, reckless and/or grossly negligent.

126.    The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Nelnet, thus Nelnet was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' PII left that information in a dangerous condition.

127.    Similarly, the potential for improper disclosure by retaining an external technology provider such as Nelnet was also a known risk to OSLA.[48] Thus, OSLA was on notice that failing to take the necessary steps to ensure Nelnet secured Plaintiffs' and Class Members' PII left that information in a dangerous condition.

---

[48] *See* InfoSecPPG §§ 5.2(5)(A–C), 7.9(2).

128.    Nelnet disregarded the rights of Plaintiffs and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

129.    OSLA disregarded the rights of Plaintiffs and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to ensure Nelnet had adequate data security; (ii) failing to investigate and confirm Nelnet's network servers were protected against unauthorized intrusions; (iii) failing to disclose that Nelnet did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' PII; (iv) failing to ensure Nelnet took standard and reasonably available steps to prevent the Data Breach; (v) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (vi) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

130.    The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly and/or proximately caused by Defendants' wrongful actions and/or inaction, *infra*, and the resulting Data Breach require Plaintiffs and Class

Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiffs and Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

**I.    Plaintiffs' Individual Experiences.**

**_i.    Plaintiff Kathleen Carr's Experience._**

110.    OSLA and Nelnet required Plaintiff Carr to provide her PII to Defendants in order to create an account and/or make student loan payments via the payment portal provided by OSLA and Nelnet.

111.    OSLA acquired, collected, and stored Plaintiffs' and Class Members' PII. By virtue of OSLA's relationship with Nelnet, Nelnet also acquired, collected, and stored Plaintiffs' and Class Members' PII through the technology services it provided to OSLA. OSLA is obligated by law, regulations, and guidelines to ensure Nelnet maintained adequate data security for Plaintiffs and the Class.

112.    Defendants were in possession of Plaintiff Carr's PII before, during, and after the Data Breach.

113.    Plaintiff Carr was notified she was a victim of the Data Breach, and that her

PII was impacted, via the Notice Letter sent by OSLA.[49]

114.    As a direct and traceable result of the Data Breach, Plaintiff Carr has spent approximately **20 hours** researching the Data Breach, reviewing, and monitoring her accounts for fraudulent activity, setting up credit monitoring services through Experian, and reviewing credit reports for fraudulent activity. However, this is not the end. Plaintiff Carr and the Class will now be forced to expend additional time to review their credit reports and monitor their accounts for the rest of their lives. This is time spent at OSLA's direction, which has been lost forever and cannot be recaptured.

115.    Plaintiff Carr places significant value in the security of her PII and does not readily disclose it. Plaintiff Carr entrusted her PII to Defendants with the understanding that Defendants would keep her information secure and that Defendants would employ reasonable and adequate security measures to ensure that her PII would not be compromised.

116.    Likewise, Plaintiff Carr entrusted her PII to OSLA with the understanding that OSLA would not hire entities to provide technology services that did not employ adequate data security, such as Nelnet.

117.    As a direct and traceable result of the Data Breach, Plaintiff Carr suffered actual damages such as: (1) lost time related to monitoring her accounts for fraudulent activity; (2) loss of privacy due to her PII being exposed to cybercriminals; (3) loss of the benefit of the bargain because Defendants did not adequately protect her PII; (4) severe

---

[49] *See* Exhibit 1 (Notice Letter).

emotional distress because identity thieves now possess her first and last name paired with her Social Security Number; (5) exposure to increased and imminent risk of fraud and identity theft now that her PII has been exposed; (6) the loss in value of her PII due to her PII being in the hands of cybercriminals who can use it at their leisure; and (7) other economic and non-economic harm.

118.    Plaintiff Carr was notified by Norton that some of her sensitive PII was found on the dark web, which means it is readily accessible to criminal actors. As a result, it is not a matter of *if* her PII will be used for fraudulent purposes, but *when*.

119.    Also, as a direct and traceable result of the Data Breach, Plaintiff Carr has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach and the fact Plaintiff has received a notification from Norton that her PII was found on the dark web. Indeed, OSLA acknowledged the increased risk of future harm Plaintiffs and the Class now face by offering complimentary credit monitoring services to Plaintiffs and the Class.

120.    Knowing that thieves intentionally targeted and stole her PII, including her Social Security number, and knowing that her PII is available on the dark web has caused Plaintiff Carr great anxiety beyond mere worry. Specifically, Plaintiff Carr has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her PII has been exposed in the Data Breach.

121.    Plaintiff Carr has a continuing interest in ensuring that her PII which, upon

information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches.

122.    As a direct and traceable result of the Data Breach, Plaintiff Carr will continue to be at heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come and will have to pay an identity monitoring company for the rest of her life to protect her exposed PII.

### ii.    *Plaintiff Killory's Experience.*

123.    OSLA and Nelnet required Plaintiff Killory to provide his PII to Defendants in order to create an account and/or make student loan payments via the payment portal provided by OSLA and Nelnet.

124.    OSLA acquired, collected, and stored Plaintiffs' and Class Members' PII. By virtue of OSLA's relationship with Nelnet, Nelnet also acquired, collected, and stored Plaintiffs' and Class Members' PII through the technology services it provided to OSLA. OSLA is obligated by law, regulations, and guidelines to ensure Nelnet maintained adequate data security for Plaintiffs and the Class.

125.    Defendants were in possession of Plaintiff Killory's PII before, during, and after the Data Breach.

126.    Plaintiff Killory was notified he was a victim of the Data Breach, and that his PII was impacted, via the Notice Letter sent by OSLA.[50]

127.    As a direct and traceable result of the Data Breach, Plaintiff Killory has spent

---

[50] *See* Exhibit 2 (Notice Letter).

approximately **100 hours** researching the Data Breach, reviewing, and monitoring his accounts for fraudulent activity, reviewing his credit reports, and researching credit monitoring services. However, this is not the end. Plaintiff Killory and Class Members will be forced to expend additional time to review their credit reports and monitor their accounts for the rest of their lives. This is time spent at OSLA's direction, which has been lost forever and cannot be recaptured.

128.   Plaintiff Killory places significant value in the security of his PII and does not readily disclose it. Plaintiff Killory entrusted his PII to Defendants with the understanding that Defendants would keep his information secure and would employ reasonable and adequate security measures to ensure that his PII would not be compromised.

129.   Likewise, Plaintiff Killory entrusted his PII to OSLA with the understanding that OSLA would not hire entities to provide technology services that did not employ adequate data security, such as Nelnet.

130.   As a direct and traceable result of the Data Breach, Plaintiff Killory suffered actual damages such as: (1) lost time related to monitoring his accounts for fraudulent activity; (2) loss of privacy due to his PII being exposed to cybercriminals; (3) loss of the benefit of the bargain because Defendants did not adequately protect his PII; (4) severe emotional distress because identity thieves now possess his first and last name paired with his Social Security number; (5) exposure to increased and imminent risk of fraud and identity theft now that his PII has been exposed; (6) the loss in value of his PII due to his PII being in the hands of cybercriminals who can use it at their leisure; and (7) other

economic and non-economic harm.

131.    Plaintiff Killory has experienced actual misuse of his PII since the Data Breach. Specifically, Plaintiff Killory has experienced a swath of spam emails and spam phone calls. Plaintiff Killory estimates he receives approximately twenty (20) spam emails per day and two to three spam phone calls per day. These spam calls and emails were unsolicited by Plaintiff Killory.

132.    Plaintiff Killory was also notified by Credit Karma that some of his sensitive PII was found on the dark web, which means it is readily accessible to criminal actors to be used at their leisure.

133.    Also, as a direct and traceable result of the Data Breach, Plaintiff Killory has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach and the fact Plaintiff Killory has been notified by Credit Karma that his PII has been found on the dark web. Indeed, OSLA also acknowledged the increased risk of future harm Plaintiffs and the Class now face by offering complimentary credit monitoring services to Plaintiffs and the Class.

134.    Knowing that thieves intentionally targeted and stole his PII, including his Social Security number, and knowing that his PII is available on the dark web has caused Plaintiff Killory great anxiety beyond mere worry. The Data Breach has exacerbated existing mental health issues Plaintiff Killory has and now Plaintiff Killory is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that his PII has

been exposed in the Data Breach.

135.   Plaintiff Killory has a continuing interest in ensuring that his PII, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches.

136.   As a direct and traceable result of the Data Breach, Plaintiff Killory will continue to be at heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come and will have to pay an identity monitoring company for the rest of his life to protect his exposed PII.

### iii.    Plaintiff Powell's Experience.

137.   OSLA and Nelnet required Plaintiff Powell to provide her PII to Defendants in order to create an account and/or make student loan payments via the payment portal provided by OSLA and Nelnet.

138.   OSLA acquired, collected, and stored Plaintiffs' and Class Members' PII. By virtue of OSLA's relationship with Nelnet, Nelnet also acquired, collected, and stored Plaintiffs' and Class Members' PII through the technology services it provided to OSLA. OSLA is obligated by law, regulations, and guidelines to ensure Nelnet maintained adequate data security for Plaintiffs and the Class.

139.   Defendants were in possession of Plaintiff Powell's PII before, during, and after the Data Breach.

140.   Plaintiff Powell was notified she was a victim of the Data Breach, and that

her PII was impacted, via the Notice Letter sent to her by OSLA.[51]

141.    As a direct and traceable result of the Data Breach, Plaintiff Powell has spent at least **100 hours** researching the Data Breach, reviewing, and monitoring her accounts for fraudulent activity, reviewing her credit reports for fraudulent activity, reporting, and closing fraudulently opened accounts, freezing her credit with the credit bureaus, and researching her options for credit monitoring services. However, this is not the end. Plaintiff Powell and Class Members will now be forced to expend additional time to review their credit reports and monitor their accounts for the rest of their lives. This is time spent at OSLA's direction, which has been lost forever and cannot be recaptured.

142.    Plaintiff Powell places significant value in the security of her PII and does not readily disclose her PII. Plaintiff Powell entrusted her PII to Defendants with the understanding that Defendants would keep her information secure and would employ reasonable and adequate security measures to ensure that her PII would not be compromised.

143.    Likewise, Plaintiff Powell entrusted her PII to OSLA with the understanding that OSLA would not hire entities to provide technology services that did not employ adequate data security, such as Nelnet.

144.    As a direct and traceable result of the Data Breach, Plaintiff Powell suffered actual damages such as: (1) lost time related to monitoring her accounts for fraudulent activity and to mitigating the fraudulent activity that has already occurred; (2) loss of

---

[51] *See* Exhibit 3 (Notice Letter).

privacy due to her PII being exposed to cybercriminals; (3) loss of the benefit of the bargain because Defendants did not adequately protect her PII; (4) severe emotional distress because identity thieves now possess her first and last name paired with her Social Security Number and have already fraudulently used her PII; (5) exposure to increased and imminent risk of fraud and identity theft now that her PII is in the hands of cybercriminals and has already been used for fraudulent purposes; (6) the loss in value of her PII now that she is not as freely capable of obtaining credit as she was before the Data Breach; (7) actual misuse of her PII (as discussed below); and (8) other economic and non-economic harm.

145.    Plaintiff Powell has experienced at least ***thirty-eight (38)*** instances of actual misuse of her PII directly related to the Data Breach. For example, the following fraudulent activity has occurred:

> a)   A fraudulent Best Buy credit card (issued through Citi Bank) was opened in Plaintiff Powell's name *without* her knowledge or consent after the Data Breach. There was an attempted purchase of $1,780.00 on this card that Plaintiff Powell did not make nor authorize.

> b)   A fraudulent account was opened with Meijer (issued through Citi Bank) in Plaintiff Powell's name *without* her knowledge or consent in or around August 2022. There was a  purchase of approximately $753.00 on this card that Plaintiff Powell did not make nor authorize.

> c)   A fraudulent Forever 21 credit card (issued through Comenity Capital Bank) was opened in Plaintiff Powell's name *without* her knowledge or consent in August 2022. There was a purchase of over $700.00 on this card that Plaintiff

Powell did not make nor authorize. An additional $200.00 in late fees also accrued on this account because Plaintiff was unaware the account even existed. Plaintiff Powell never received notice that the account was opened due to her address being fraudulently changed (discussed below).

d) On or around August 24, 2022, a Credit First N.A. account was opened in Plaintiff Powell's name *without* her knowledge or consent. Over $1,700 worth of auto parts and supplies were purchased without Plaintiff Powell's knowledge nor authorization.

e) A fraudulent Kohl's credit card (issued by Capital One, N.A.) was opened in Plaintiff Powell's name *without* her knowledge or consent in or around August 2022.

f) A fraudulent account was opened with Verizon Wireless without Plaintiff Powell's knowledge or consent on or around August 13, 2022. Using this fraudulent account, two phones were purchased, totaling $310.36 and the account accrued an additional $1,888.25 in late fees and monthly charges. These charges were without Plaintiff Powell's knowledge or consent.

g) A fraudulent credit card was opened with Target (issued through TD Bank USA) in Plaintiff Powell's name *without* her knowledge or consent on or around August 11, 2022. The fraudulent user spent approximately $88.36 without Plaintiff Powell's knowledge nor authorization.

h) Additionally, the following credit inquiries/ attempts were made to open the below listed accounts without Plaintiff Powell's knowledge or consent:

    i.     Comenity Bank/Jared Galleria credit card (attempt made on or around August 25, 2022).

    ii.    Kohls/Capital One credit card (attempt made on or around August 19, 2022).

    iii.   Auto Club Group account (attempt made on or around August 21, 2022).

    iv.   Capital One/SAKS Fifth Avenue credit card (attempt made on or around August 21, 2022).

    v.    Capital One credit card (attempt made on or around August 21, 2022).

    vi.   Citi Bank/Best Buy credit card (attempt made in or around August 2022).

    vii.   Citi Bank/Home Depot credit card (attempt made on or around Aug. 19, 2022).

   viii.   Citi Bank/Macy's credit card (attempt made on or around August 18, 2022).

    ix.   Citi Bank/Shell credit card (attempt made on or around August 22, 2022).

    x.    Comenity Bank/GameStop credit card (at least two (2) attempts made on or around October 18, 2022).

    xi.   Comenity Bank/Kay Jewelers credit card (attempt made on or around August 23, 2022).

xii.    Comenity Bank/Zales credit card (attempt made on or around August 23, 2022).

xiii.    Costco credit card (attempt made on or around August 22, 2022).

xiv.    Fortiva Retail Credit account (attempt made on or around August 23, 2022).

xv.    SYNCB/BELK credit card (attempt made in or around August 2022).

xvi.    Synchrony Bank/Sam's Club credit card (attempt made on or around August 18, 2022).

xvii.    Synchrony Financial credit card (two attempts made on or around August 19, 2022, and August 25, 2022).

xviii.    Synchrony Bank/DSGI Dual Card account (attempt made on or around August 20, 2022).

xix.    Synchrony Bank/JC Penney PLCC (attempt made on or around August 21, 2022).

xx.    Synchrony/Gardner White credit card (attempt made on or around August 21, 2022).

xxi.    TAB Bank/Family of Pets LLC credit card (attempt made on or around September 2022).

xxii.    TBOM Genesis/Jared Galleria credit card (attempt made on or around late August or early September 2022).

xxiii.    TBOM Genesis/Kay Jewelers credit card (at least two (2) attempts made on or around August 2022).

     xxiv.   TD Bank USA/Nordstrom credit card (attempt made in or around August 2022).

     xxv.   United Consumer credit card (at least two (2) attempts made in or around September 2022).

     xxvi.   Von Maur credit card (attempt made on or around August 24, 2022).

     xxvii.   Wells Fargo/Micro Center credit card (attempt made in or around late August or early September 2022).

Due to the proximity of these occurrences to the Data Breach, Plaintiff Powell reasonably believes they are a direct result of the Data Breach.

146.   As a result of criminal actors having Plaintiff Powell's sensitive PII, after the Data Breach, Plaintiff Powell's mailing address was changed with the United States Postal Service ("USPS") without her knowledge or consent, by an unknown actor, to an address she was not associated with. Plaintiff Powell did not receive mail from USPS for approximately three (3) weeks as a result of the fraudulent change of address, which allowed more fraudulent accounts to be opened in Plaintiff Powell's name without her knowledge or consent because she was not receiving any mail stating the accounts had been opened. Plaintiff Powell endured a lengthy and cumbersome process with USPS to get her address changed back to her actual address.

147.   These instances of fraud have already caused detrimental effects to Plaintiff Powell. Indeed, Plaintiff Powell's credit score has dropped approximately 150 points due to the fraudulently opened accounts and credit inquiries in her name. Due to Plaintiff Powell's credit score being negatively impacted, when Plaintiff Powell sought to purchase

a car after the Data Breach, she was forced to obtain a co-signor on her car loan and could not obtain the loan by herself. As a result, Plaintiff Powell's PII has decreased in value because she is no longer able to freely purchase goods and services without the need to pay cash or obtain a co-signor as she was before the Data Breach.

148.    Also, as a result of the fraud and identity theft Plaintiff Powell experienced, she was forced to file a police report with the Monroe County Sheriff's office on August 25, 2022, reporting identity theft and fraud.

149.    Plaintiff Powell's phone number has also been misused as a result of the Data Breach. After the Data Breach, Plaintiff Powell has consistently received approximately two to three spam calls per day from unknown numbers. These calls were not solicited by Plaintiff Powell.

150.    Also, as a direct and traceable result of the Data Breach, Plaintiff Powell has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach and the actual misuse of her PII that has already occurred. Indeed, OSLA also acknowledged the increased risk of future harm Plaintiffs and the Class now face by offering complimentary credit monitoring services to Plaintiffs and the Class.

151.    Knowing that thieves intentionally targeted and stole her PII (including her Social Security number) and knowing that her PII has likely been sold on the dark web because her PII has already been misused, has caused Plaintiff Powell immense anxiety that is beyond mere worry. Plaintiff Powell is currently in school to obtain her PhD in

criminal justice. Responding to the ramifications of the Data Breach has taken away at least

100 hours from her studies causing her severe stress and anxiety. Plaintiff Powell has lost

hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent

worry now that her PII has been exposed in the Data Breach and misused.

152.    Plaintiff Powell has a continuing interest in ensuring that her PII, which,

upon information and belief, remains in the possession of Defendants, is protected, and

safeguarded from future data breaches.

153.    As a direct and traceable result of the Data Breach, Plaintiff Powell will

continue to be at heightened risk for financial fraud, identity theft, other forms of fraud,

and the attendant damages, for years to come and will have to pay an identity monitoring

company for the rest of her life to protect her exposed PII.

**J.    Plaintiffs and the Class Members Suffered Damages.**

154.    The ramifications of Nelnet's failure to keep Plaintiffs' and the Class's PII

secure, and OSLA's failure to ensure Nelnet kept Plaintiffs' and Class Members' PII

secure, are long lasting and severe. Once PII is stolen, fraudulent use of that information

and damage to victims may continue for years.[52]

155.    The PII belonging to Plaintiffs and Class Members is private, sensitive in

nature, and was left inadequately protected by Defendants who did not obtain Plaintiffs' or

Class Members' consent to disclose such PII to any other person as required by applicable

---

[52] *2014 LexisNexis True Cost of Fraud Study: Post-Recession Revenue Growth Hampered by Fraud as all Merchants Face Higher Costs*, LEXISNEXIS (Aug. 2014), available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

law and industry standards.

156.   Defendants required Plaintiffs and Class Members to provide their PII, including full names and Social Security numbers in order for OSLA to service their student loans and for Nelnet to provide technology services attendant thereto. Defendants similarly required that Plaintiffs and Class Members allow them to maintain that PII for the length of the student loan servicing relationship. Implied in these exchanges was a promise by Defendants to ensure that the PII of Plaintiffs and Class Members in their possession was only used to provide the agreed-upon student loan servicing services from Defendants and that Defendants would not continue to maintain that PII once the relationship was terminated.

157.   Plaintiffs and Class Members therefore did not receive the benefit of the bargain with Defendants, because providing their PII to Defendants was in exchange for Defendants' implied agreement to secure it and keep it safe and to delete it following the end of the relationship. Had Plaintiffs and Class Members known that Defendants would not safeguard their PII, or that OSLA would hire a technology services company such as Nelnet with inadequate data security, Plaintiffs and Class Members would not have provided their PII, would have taken additional precautions, would have reported Defendants to the appropriate government entity, or would have demanded better data security.

158.   Plaintiffs also were injured in that the Value of their PII has diminished as a result of the Data Breach. PII is a valuable property right and there is an active marketplace

for non-public consumer date both on the dark web[53] and for legitimate enterprises who

act as data brokers like Experian or Equifax. In 2019, the data brokering industry was worth

roughly $200 billion.[54] In fact, the data marketplace is so sophisticated that consumers can

actually sell their non-public information directly to a data broker who in turn aggregates

the information and provides it to marketers or app developers.[55] [56] Consumers who agree

to provide their web browsing history to the Nielsen Corporation can receive up to $50.00

a year.[57] Accordingly, Plaintiffs and Class Members have lost the ability to control how

and where their PII is used and by whom.

     159.    The Data Breach was a direct and proximate result of Nelnet's failure to: (a)

---

[53] Brian Stack, *Here's How Much Your Personal Information is Selling on for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Apr. 7, 2023).

[54] David Lazarus, *Column: Shadowy Data Brokers Make the Most of their Invisibility Cloak*, LOS ANGELES TIMES (Nov. 5, 2019, 5:00 AM PT) https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Apr. 7, 2023).

[55] DATA COUP, The Personal Data Revolution, https://datacoup.com/ (last visited Apr. 7, 2023) ("Earn cash, discounts, or cryptocurrency for connecting and exchanging your valuable data. Keep earning through ongoing data sales.").

[56] DIGI.ME, https://digi.me/ (last visited Apr. 7, 2023) ("We work with personal data category experts to ensure you get the best access to fitness data, social media content, entertainment interests, financial transactions, health and medical records and so much more. All with explicit, informed, and recorded end-user consent.").

[57] NIELSEN COMPUTER & MOBILE PANEL, *Frequently Asked Questions*, What Rewards Can I Earn?, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Apr. 7, 2023).

properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII; (c) delete and destroy PII that it was not required to maintain; and (d) protect against reasonably foreseeable threats to the security or integrity of such information.

160.    The Data Breach was also a direct and proximate result of OSLA's failure to ensure Nelnet: (a) properly safeguarded and protected Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) established and implemented appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII; (c) deleted and destroyed PII that Nelnet was not required to maintain; and (d) protected against reasonably foreseeable threats to the security or integrity of such information.

161.    Nelnet had the resources necessary to prevent the Data Breach, but neglected to implement adequate data security measures, despite its obligations to protect Plaintiffs' and the Class's PII. OSLA also had the resources necessary to prevent the Data Breach but neglected to hire a technology services company with adequate data security measures, despite its obligations to protect the PII of Plaintiffs and the Class.

162.    Had Nelnet remedied the deficiencies in in its data security training and protocols,  adopted security measures recommended by experts in the field, and complied

with the InfoSecPPG, it would have prevented the intrusion leading to the theft of PII. Had OSLA ensured Nelnet remedied the deficiencies in in its data security training and protocols, adopted security measures recommended by experts in the field, and complied with the InfoSecPPG, it would have prevented the intrusion leading to the theft of PII.

163.   Had Defendants deleted or destroyed the PII of Plaintiffs and the Class that it was not required to maintain, Plaintiffs and Class Members would not have suffered the injuries described herein resulting from the Data Breach.

164.   As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

165.   The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[58]

166.   As a direct result of the Defendants' failures to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of

---

[58] Erika Harrell and Lynn Langton, *Victims of Identity Theft, 2012*, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS BUREAU OF JUSTICE STATISTICS (Dec. 2013), available at https://www.bjs.gov/content/pub/pdf/vit12.pdf.

suffering:

a. The compromise, publication, theft, and/or unauthorized use of their PII;

b. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

d. The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake appropriate measures to protect the PII in its possession; and

e. Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

167. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

168.    To date, other than OSLA providing a woefully inadequate token gesture of twenty-four (24) months of credit monitoring and identity protection services, Defendants do not appear to be taking any measures to assist Plaintiffs and Class Members other than simply telling them to review their financial records and credit reports on a regular basis.

169.    This type of recommendation, however, does not require Defendants to expend any effort to protect Plaintiffs' and Class Members' PII.

170.    Defendants' failure to adequately protect Plaintiffs' and Class Members' PII has resulted in Plaintiffs and Class Members having to undertake tasks requiring extensive amounts of time, and calls, while Defendants sit by and do nothing to assist those affected by the Data Breach. Instead, as OSLA's Notice Letter indicates, it is putting the burden on Plaintiffs and Class Members to discover possible fraudulent activity and identity theft and unfortunately, all Plaintiffs have already experienced fraudulent activity or have been notified their information is on the dark web because of the Data Breach.

171.    OSLA's offer of twenty-four (24) months of identity monitoring and identity protection services to Plaintiffs and Class Members is woefully inadequate. While harm has begun already, the worst is yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is acquired and when it is used. Furthermore, identity theft monitoring services only alert someone to the fact that they have *already* been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's PII) – they do not prevent identity theft.[59] Although their PII was

---

[59] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, CNBC (Nov. 30, 2017, 9:00 AM EST) (updated Nov. 30, 2017, 9:01 AM EST)

improperly exposed in the Data Breach in June 2022, victims of the Data Breach were not notified of the Data Breach by OSLA until approximately *eight (8) weeks* later, depriving them of the ability to promptly mitigate or even discover adverse consequences resulting from the Data Breach. As a result of Defendants' delay in detecting and notifying victims of the Data Breach, the risk of, and actual, fraud for Plaintiffs and Class Members has been driven even higher.

## VI.    CLASS ACTION ALLEGATIONS

172.    Plaintiffs bring this action individually and on behalf of all members of the following class of similarly situated persons (collectively, the "Class" or "Class Members"):

**Nationwide Class**

All persons residing in the United States who received a Notice Letter from OSLA and had their PII compromised by an unknown third-party cybercriminal as a result of the Data Breach that occurred in or around June 2022 through July 2022.

Excluded from the proposed Class are any employees, officers, or directors of Nelnet and OSLA; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

173.    **Numerosity.** Upon knowledge and belief, there are approximately 250,000 Members of the proposed Class and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from OSLA's and Nelnet's own

---

https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Apr. 7, 2023).

records.

174.   **Commonality and Predominance.** Common questions of law and fact exist as to all proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a.    Whether Defendants engaged in the wrongful conduct alleged herein;

b.    Whether Nelnet's inadequate data security measures were a cause of the Data Breach;

c.    Whether OSLA's failure to ensure Nelnet implemented adequate data security measures was a cause of the Data Breach;

d.    Whether Defendants owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e.    Whether Defendants negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

f.    Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

g.    Whether Nelnet failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII in violation Section 5 of the FTC Act;

h.    Whether Defendants improperly retained the PII of Plaintiffs and Class Members after the loan servicing relationship ended or after they were no longer required to maintain the PII;

i.    Whether Plaintiffs and the other Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

j.    Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

142.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

143.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Defendants' misconduct impacted all Class Members in the same manner.

144.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of

the Class will be fairly and adequately protected by Plaintiffs and their counsel.

145.   **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against Nelnet)**

146.   Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

147.   OSLA acquired, collected, and stored Plaintiffs' and Class Members' PII. By virtue of OSLA's relationship with Nelnet, Nelnet also acquired, collected, and stored Plaintiffs' and Class Members' PII through the technology services it provided to OSLA.

148.    By collecting and maintaining sensitive PII, Nelnet had a common law duty of care to use reasonable means to secure and safeguard the sensitive PII of Plaintiffs and the Class and to prevent disclosure of this PII to unauthorized individuals. Nelnet's duties included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

149.    Nelnet owed a duty of care to Plaintiffs and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

150.    Nelnet's duty of care arose as a result of, among other things, the special relationship that existed between Nelnet, OSLA, and Plaintiffs and the Class.

151.    Nelnet was subject to an "independent duty" untethered to any contract between Plaintiffs and Class Members and Defendants.

152.    Nelnet breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and the Class's sensitive PII. Nelnet's negligent acts and omissions include, but are not limited to, the following:

   a)  failure to employ systems and educate employees to protect against malware;

   b)  failure to comply with industry standards for software and server security;

   c)  failure to track and monitor access to their network and PII;

   d)  failure to limit access to those with a valid purpose;

   e)  failure to adequately staff and fund their data security operations;

   f)  failure to remove, delete, or destroy highly sensitive PII of Plaintiffs and the Class that is no longer being used for any valid business purpose;

g) failure to use due care in hiring, promoting, and supervising those responsible for its data security operations;

h) failure to recognize that hackers were stealing PII from its network while the Data Breach was taking place; and

i) failure to oversee the entrustment of student loan borrowers' PII.

153.    It was foreseeable by Nelnet that a failure to use reasonable measures to protect Plaintiffs' and the Class's sensitive PII could result in injury to Plaintiffs and the Class. Further, actual, and attempted breaches of data security were reasonably foreseeable to Nelnet given the known frequency of data breaches and various warnings from industry experts.

154.    As a direct and proximate result of Nelnet's negligence, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

155.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Nelnet to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

### SECOND CAUSE OF ACTION
**NEGLIGENCE PER SE**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against Nelnet)**

156.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein for the allegations below.

**A.      Nelnet's Violations of the FTC Act Constitutes Negligence Per Se.**

157.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted, and enforced by the FTC, the unfair act or practice by companies such as Nelnet for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Nelnet's duty.

158.    Nelnet violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Nelnet's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

159.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

160.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

161.    As a direct and proximate result of Nelnet's negligence, Plaintiffs and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

162.    Nelnet's violations of Section 5 of the FTC Act constitute *Negligence Per Se*.

163.    As a result of Nelnet's *Negligence Per Se*, Plaintiffs and Class Members are

also entitled to injunctive relief requiring Nelnet to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

**B.    Nelnet's Violations of the InfoSecPPG Constitutes Negligence Per Se.**

164.    The InfoSecPPG constitutes a regulation, as the OMES promulgated it under a statutory directive that it "establish and enforce minimum mandatory standards for . . . information security and information controls." 62 O.S. § 34.12(A).

165.    Plaintiffs and Class Members were within the class of persons that this statute was designed to protect, and the harm and risk of harm that Plaintiffs and Class Members have experienced and are exposed to is the kind of harm that this statutory provision was designed to prevent.

166.    Nelnet was required to comply with the standards set forth by OMES in the InfoSecPPG, as an entity, and/or contractor hired by OSLA for technology services.

167.    Nelnet violated these regulations and breached their duties owed to Plaintiffs and the Class by: (1) failing to implement and maintain adequate data security, practices, procedures, infrastructure, and protocols; (2) failing to maintain a secure environment for the storage of Plaintiffs' and the Class's PII; (3) failing to secure Plaintiffs' and the Class's PII from public disclosure, which resulted in the Data Breach; (4) failing to encrypt Plaintiffs' and the Class's PII it stored and maintained; (5) failing to protect Plaintiffs' and the Class's information from unauthorized disclosure; (6) failing to complete required risk management and assessments to determine the likelihood of an adverse event, the threats

to system resources, the vulnerability of the system, and the impact such an adverse event may have; (7) initiate and implement the appropriate risk mitigation; (8) failing to properly train staff on the matters of data security; and (9) failing to follow all other requirements set forth for data security in the InfoSecPPG.

168.    Plaintiffs' and Class Members' injuries were proximately caused by Nelnet's violations of these regulations, as set forth herein.

169.    Thus, Nelnet's violations of the InfoSecPPG constituted *Negligence Per Se.*

170.    Accordingly, Plaintiffs and Class Members are entitled to damages and injunctive relief in an amount to be decided at trial.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against OSLA)**

171.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

172.    OSLA solicited, gathered, and stored the PII of Plaintiffs and Class Members, which was in turn provided to Nelnet so that Nelnet could provide technology services to OSLA.

173.    OSLA had full knowledge of the sensitivity of the PII that OSLA possessed and provided to Nelnet and the potential harm that Plaintiffs and Class Members could and would suffer if their PII were wrongfully disclosed by OSLA or Nelnet.

174.    OSLA had a duty to Plaintiffs and Class Members to exercise reasonable care in selecting, monitoring, and ensuring any technology service providers it hired used

adequate data security, procedures, and protocols to prevent foreseeable harm to Plaintiffs and the Class pursuant to the provisions of the InfoSecPPG.

175.    OSLA had a common law duty to exercise reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when selecting a technology provider, such as Nelnet, to provide technology services that included Nelnet storing, safeguarding, handling, collecting, and protecting the PII provided by Plaintiffs and the Class. This duty included taking action to ensure Nelnet adequately safeguarded such data, that Nelnet was aware of its security requirements under the InfoSecPPG, and that Nelnet implemented the security requirements in the InfoSecPPG. OSLA utterly failed to do any of the above.

176.    OSLA was also responsible for providing timely notification of the Data Breach to Plaintiffs and Class Members but failed to do so.

177.    OSLA breached its duties owed to Plaintiffs and the Class.

178.    Plaintiffs and the Class were injured as a direct and proximate result of OSLA's breaches of their duties.

179.    Plaintiffs and Class Members continue to suffer damages and are at an imminent risk of additional harms and damages due to OSLA's breaches.

180.    Accordingly, Plaintiffs and the Class are entitled to compensatory and injunctive relief in an amount to be set forth at trial.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against OSLA)**

181.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth

herein.

182.    The InfoSecPPG constitutes a regulation, as the OMES promulgated it under a statutory directive that it "establish and enforce minimum mandatory standards for . . . information security and information controls." 62 O.S. § 34.12(A).

183.    The InfoSecPPG regulations, including those specific requirements contained in sections 1.0, 1.1, 1.3, 2.1, 2.2, 4.1, 5.2, 7.9, 9.22, were designed to protect the PII of Plaintiffs and Class Members.

184.    Plaintiffs and Class Members were within the class of persons that this statute was designed to protect, and the harm and risk of harm that Plaintiffs and Class Members have experienced and are exposed to is the kind of harm that this statutory provision was designed to prevent.

185.    OSLA was required to comply with the InfoSecPPG regulations as a State agency.

186.    OSLA violated these regulations and its duties owed to Plaintiffs and the Class when it failed to: (1) ensure Nelnet implemented adequate data security, practices, procedures, infrastructure, and protocols compliant with the InfoSecPPG and other applicable law; (2) brief and advise Nelnet of its duties under the InfoSecPPG; (3) ensure Nelnet had adequate processes in place to quickly detect a data breach and to timely act on warnings about data breaches; (4) investigate Nelnet's data security practices, infrastructure, procedures, and protocols prior to hiring Nelnet; and (5) monitor Nelnet's security procedures, practices, and protocols during the relationship.  Finally, OSLA had a

duty to promptly report the Data Breach to law enforcement, to promptly investigate the causes of the breach, and to promptly notify affected persons.

187.    OSLA has utterly failed to uphold these duties, as evidenced by the Data Breach, thereby breaching its duties owed to Plaintiffs and the Class.

188.    Plaintiffs and Class Members were within the class of persons that these regulatory requirements and 62 O.S. § 34.12(A) were intended to protect, and the harm and risk of harm that Plaintiffs and Class Members have experienced and are exposed to is the kind of harm that these regulations and section 34.12(A) were designed to prevent.

189.    Plaintiffs and Class Members were injured as a result of the OSLA's breach of its non-delegable duties to Plaintiffs and the Class.

190.    Plaintiffs' and Class Members' injuries, as set forth herein, were directly and proximately caused by the OSLA's violations of these regulations.

191.    Accordingly, Plaintiffs and Class Members are entitled to injunctive relief and damages in an amount to be decided at trial.

**FIFTH CAUSE OF ACTION**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against Nelnet)**

192.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

193.    Plaintiffs and Class Members are intended third-party beneficiaries of contracts entered into between Nelnet and OSLA (the "contracting parties"), including a

contract entered into before the Data Breach to provide technology services from Nelnet to OSLA (the "Contract").

194.    The sole purpose of the technology services Nelnet provided was to provide a customer website portal for OSLA and to protect the PII of Plaintiffs' and Class Members collected and maintained in that portal.

195.    The website portal was known by both OSLA and Nelnet to contain the sensitive PII of Plaintiffs and Class Members.

196.    The Contract was therefore made expressly for the benefit of Plaintiffs and Class Members, to maintain the security of their PII so that OSLA could use that information for loan servicing purposes directly benefitting Plaintiffs and the Class.

197.    Exposure, breach, and identity theft were the expected risks both contracting parties could foresee from the improper performance of the Contract.

198.    The injuries suffered by Plaintiffs and Class Members were the kind that proper performance was intended to prevent.

199.    Accordingly, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against Nelnet)**

200.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

201.    As previously alleged and pleaded, Defendants owed duties of care to Plaintiffs and Class Members that required it to adequately secure and protect the PII of Plaintiffs and the Class.

202.    Defendants still possess the PII of Plaintiffs and the Class Members even after the Data Breach.

203.    Defendants have not satisfied their obligations and legal duties to Plaintiffs and the Class Members.

204.    According to the Notice Letter, Nelnet took some steps to increase their data security but it is unclear whether those steps are adequate or how long they will continue. Moreover, there is nothing to prevent Nelnet from reversing these changes once it has weathered the increased public attention resulting from this Data Breach, and to once again place profits above protection.

205.    Plaintiffs, therefore, seek a declaration that (1) Nelnet's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) to comply with its obligations and duties of care, Nelnet must implement and maintain reasonable security measures, including, but not limited to:

      a)    Ordering Nelnet to engage third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Nelnet's systems on a periodic basis, and ordering Nelnet to promptly correct any problems or issues detected by such third-party security auditors;

b)     Ordering Nelnet to significantly increase its spending on cybersecurity, including systems and personnel;

c)     Ordering Nelnet to engage third-party security auditors and internal personnel to run automated security monitoring;

d)     Ordering that Nelnet audit, test, and train its security personnel regarding any new or modified procedures;

e)     Ordering that Nelnet purge, delete, and destroy in a reasonably secure manner any PII not necessary for its provisions of services;

f)     Ordering that Nelnet conduct regular database scanning and securing checks;

g)     Ordering Nelnet to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

h)     Ordering Nelnet to implement and enforce adequate retention policies for PII, including destroying PII as soon as it is no longer necessary for it to be retained; and

i)     Ordering Nelnet to meaningfully educate Plaintiffs and the Class about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they must take to protect themselves.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENT TRAINING, HIRING, AND SUPERVISION**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against OSLA)**

206.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

207.    At all relevant times, Nelnet was OSLA's agent. OSLA granted Nelnet access to the PII of Plaintiffs and the Class without properly vetting Nelnet, inquiring about/ investigating Nelnet's data security, training Nelnet, advising Nelnet of its duties owed to Plaintiffs and the Class under the InfoSecPPG, and/or advising Nelnet of the confidential nature of Plaintiffs' and the Class's PII.

208.    OSLA was negligent and failed to exercise the requisite standard of care in the hiring, supervision, and retention of Nelnet – who disclosed Plaintiffs' and the Class's PII without authorization and caused the damages delineated herein by virtue of the Data Breach.

209.    At all times relevant hereto, Defendant OSLA owed a duty to Plaintiffs and the Class to train and supervise its agents and third parties handling sensitive PII in its possession to ensure they recognized the duties owed to Plaintiffs' and the Class to keep their PII safe from data breaches.

210.    OSLA owed a duty to Plaintiffs and the Class to ensure Nelnet had adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's PII from data breaches prior to hiring Nelnet.

211.    OSLA also owed a continuing duty to Plaintiffs and the Class to ensure Nelnet continued to employ adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's PII from data breaches after hiring Nelnet.

212.    OSLA breached this duty by failing to ensure Nelnet possessed the requisite data security, procedures, practices, infrastructure, and protocols to protect Plaintiffs' and the Class's PII from data breaches prior to hiring Nelnet and while Nelnet worked for OSLA.

213.    OSLA was on notice of the importance of data security because of well publicized data breaches occurring throughout the United States and because of the information contained in the InfoSecPPG.[60] Despite knowledge of prior data breaches, OSLA failed to ensure Nelnet possessed the adequate security posture to protect Plaintiffs' and the Class's PII from unauthorized disclosure.

214.    OSLA knew or should have known that the failure to ensure Nelnet employed adequate data security, procedures, and protocols would create an unreasonable risk of danger to persons and property.

215.    As a direct and proximate result of OSLA's breach of its duties, and its negligent hiring, training, selection, and supervision, of Nelnet, which resulted in the disclosure of Plaintiffs' and Class members' confidential PII in the Data Breach, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the

---

[60] *See* InfoSecPPG §§ 5.2(5)(A–C), 7.9(2).

benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, diminution in value of their PII, and actual misuse of their PII.

216.    OSLA was advised of the Data Breach, but continued to employ Nelnet, putting Plaintiffs and the Class at risk of more data breaches in the future.

217.    The acts and omissions of OSLA in negligently hiring, retaining, training, and/or supervising Nelnet are such as to show gross negligence and reckless disregard for the safety of others and, therefore, punitive damages are appropriate.

**EIGHTH CAUSE OF ACTION**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**& UNREASONABLE PUBLICITY**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(Alleged against all Defendants)**

218.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

219.    The Oklahoma Supreme Court has set forth two elements of the intrusion-upon-seclusion tort as: (1) a nonconsensual intrusion (2) that was highly offensive to a reasonable person. *Gilmore v. Enogex, Inc.*, 878 P.2d 360, 366 (Okla. 1994).

220.    Plaintiffs shared PII with Defendants that Plaintiffs wanted to remain private and non-public.

221.    Plaintiffs reasonably expected that the PII they shared with Defendants would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties or disclosed or obtained for any improper purpose.

222.    Defendants intentionally and non-consensually intruded into Plaintiffs' and Class Members' seclusion by disclosing (via their inadequate data security, culminating in the Data Breach) without permission their PII to a third party who then sold their PII to other third-parties on the dark web. Indeed, Plaintiffs have received notifications that their PII has been found on the dark web and have suffered actual misuse of their PII as a result of Defendants' invasion of privacy.

223.    Defendants' actions also rose to the level of an intentional intrusion because Defendants acted with reckless disregard of the privacy of Plaintiffs' and the Class's PII by allowing unauthorized individuals to access Plaintiff and the Class's PII.

224.    By failing to keep Plaintiffs' and Class Members' PII secure, and disclosing PII to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, *inter alia*:

   a)  intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

   b)  invading their privacy by improperly using their PII properly obtained for specific purpose for another purpose, or disclosing it to unauthorized persons;

   c)  failing to adequately secure their PII from disclosure to unauthorized persons; and

   d)  enabling the disclosure of their PII without consent.

225.   The PII that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers and other PII. Plaintiffs' and the Class's PII is now publicly available to the public at large on the dark web.

226.   This publicity was highly unreasonable because now individuals and companies can use Plaintiffs' and the Class's PII to commit identity theft and fraud, and target advertisements and services towards Plaintiffs and the Class.

227.   Plaintiffs' experiences surpass mere fear that their social security numbers and other PII *might* be used because there have already been instances of identity theft and fraud as well as some Plaintiffs have been notified their information is on the dark web.

228.   Defendants' intrusions into Plaintiffs' and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

229.   As a direct and proximate result of Defendants' invasions of privacy, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities;

expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost value of access to their PII permitted by Defendants; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## VIII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that the Court enter an order:

    a.    Certifying the proposed Class as requested herein;

    b.    Appointing Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel;

    c.    Finding that Defendants engaged in the unlawful conduct as alleged herein;

    d.    Granting injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

        i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

        ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its

business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the PII of Plaintiffs' and Class Members' PII;

v.    prohibiting Defendants from maintaining Plaintiffs' and Class Members' PII on a cloud-based database;

vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party

security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.   requiring Defendants to conduct regular database scanning and securing checks;

xi.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class Members;

xii.   requiring Defendants to conduct internal training and education routinely and continually and, on an annual basis, inform internal security personnel how to identify and contain a breach when it occurs and what to do in

response to a breach;

xiii.    requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting PII;

xiv.    requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers;

xvii.      for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

xviii.    requiring Defendants to design, maintain, and test its computer systems to ensure that PII in its possession is adequately secured and protected;

xix.     requiring Defendants to detect and disclose any future data breaches in a timely and accurate manner;

xx.      requiring Defendants to implement multi-factor authentication requirements, if not already implemented;

xxi.     requiring Defendants' employees to change their passwords on a timely and regular basis, consistent with best practices; and

xxii.    requiring Defendants to provide lifetime credit monitoring and identity theft repair services to Class Members.

e.     Awarding Plaintiffs and Class Members damages;

f.  Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest on all amounts awarded;

g.  Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

h.  Granting such other relief as the Court deems just and proper.

## IX.  DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand a trial by jury as to all matters so triable.

Date: April 17, 2023                    Respectfully Submitted,

/s/ William B. Federman
William B. Federman, OBA #2853
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

*Attorney for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served on April 17, 2023 with a copy of this document via the Court's CM/ECF system.

/s/ William B. Federman